**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MARK D. PENTECOST,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **NO. 3:12-0154** |
| | ) | **Judge Nixon/Brown** |
| **v.** | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF THE SOCIAL** | ) | |
| **SECURITY ADMINISTRATION** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

**To: The Honorable Judge John T. Nixon, Senior United States District Judge**

<u>**REPORT AND RECOMMENDATION**</u>

The plaintiff filed this motion for judgment on the administrative record (the record) (DE 10) pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Social Security Administration (the SSA), through its Commissioner, as set out by the Administrative Law Judge (ALJ). The ALJ decided (1) that based on the plaintiff's application for a period of disability and Disability Insurance Benefits (DIB), the plaintiff was not disabled under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(i) and 423(d); and (2) that based on the plaintiff's application for Supplemental Security Income (SSI), the plaintiff was not disabled under Title XVI of the Act, 42 U.S.C. § 1382(c) (DE 10, p. 27).[1] For the reasons explained herein, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion (DE 12) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

---

1 Page numbers referring to the record herein reflect the Bates Stamp.

Case 3:12-cv-00154   Document 20   Filed 06/04/13   Page 1 of 30 PageID #: 1057

# I.    Procedural History

The plaintiff filed for SSI on April 10, 2007 (DE 10, pp. 140-61) and for DIB on May 2, 2007 (DE 10, pp. 132-39). He initially claimed an onset date of September 1, 2003 (DE 10, p. 132). His non-attorney representative, Jim Friedlob, Ed.D. (Friedlob), later made an oral motion at the hearing before the ALJ to amend the onset date to March 18, 2005 (DE 10, p. 57). The plaintiff claimed disability due to back problems, heart problems, and depression (DE 10, p. 191). On October 24, 2007, the Commissioner denied the DIB and SSI claims (DE 10, p. 78).

On November 20, 2007, the plaintiff timely filed for reconsideration (DE 10, p. 84). On May 16, 2008, the Commissioner denied both claims (DE 10, pp. 89, 92).

On June 10, 2008, the plaintiff timely requested a hearing before an ALJ (DE 10, p. 96). On April 21, 2010, the plaintiff appeared before the ALJ, James W. Lessis (DE 10, pp. 33-58). Also appearing were (1) Jim Friedlob; (2) Sherril Pentecost, witness and legally separated wife of the plaintiff (DE 10, p. 45); and (3) Calvin Turner, the vocational expert (VE).   On January 4, 2011, the ALJ denied both claims (DE 10, p. 14).

On February 18, 2011, the plaintiff timely requested that an Appeals Council (AC) review the decision (DE 10, p. 8). On December 8, 2011, an AC denied the request (DE 10, p. 1).

On February 8, 2012, the plaintiff timely filed the instant action (DE 1). On May 7, 2012, the defendant filed his answer and the record (DE 9-10). On June 19, 2012, the plaintiff filed a motion for judgment on the record and memorandum in support of the motion (DE 12-13). On September 28, 2012, the defendant filed a response in opposition (DE 18). On October 17, 2012, the plaintiff filed a reply to the response (DE 19). The matter is now properly before the Court.

Case 3:12-cv-00154   Document 20   Filed 06/04/13   Page 2 of 30 PageID #: 1058

## II.        Review of the Record

### A.        Relevant Medical Evidence

On December 1, 1995, the plaintiff underwent treatment for Wolff-Parkinson-White (WPW)[2] syndrome (DE 10, p. 425). On April 10, 1997, the plaintiff presented to the cardiologist, Dr. Robert Wheatley (DE 10, pp. 422-24) with (1) chest pains that radiated to his left arm, occurring two to three times per week; and (2) chest discomfort of a burning sensation with chest cramps (DE 10, p. 423). Dr. Wheatley indicated that the "WPW is essentially cured at this point, with no recurrent problems" and ordered screening for heart disease (DE 10, p. 424). Upon completion of the screening, Dr. Wheatley reported that: (1) the "chest pain was atypical[3] for coronary artery disease…[but that] some aspects of the pain were consistent with a musculoskeletal cause;" and (2) that the burning and cramping were suggestive of a gastrointestinal source (DE 10, p. 422).

On March 20, 2003, the plaintiff presented to Dr. Gilbert Bazaldua for a medical examination for a commercial driver fitness determination (DE 10, pp. 307-12). Dr. Bazaldua instructed the plaintiff to begin a diet since he was severely overweight (DE 10, p. 307). On November 9, 2003, the plaintiff presented to the NorthCrest Medical Center (Northcrest) Emergency Department (ED) at 17:44 with a chief complaint of chest pain (DE 10, pp. 551-63). A chest x-ray revealed no new disease and probable cardiomegaly."[4] (DE 10, p. 560).

On March 2, 2004, the plaintiff presented to Dr. Bazaldua with a chief complaint of right groin pain, exacerbated with lifting or pulling, and complaints of indigestion, heartburn, and

---

2 Dorland's Illustrated Medical Dictionary 1854 (Elsevier 2012) (1900) (Wolff-Parkinson White Syndrome: "The association of paroxysmal tachycardia or atrial fibrillation with preexcitation; the electrocardiogram displays a short P-R interval and a wide QRS complex, usually with an early QRS vector (delta wave). The term is sometimes used synonymously with preexcitation syndrome.").

3 *Id.* at 178 (Atypical: "Irregular; not conforming to type…;").

4 *Id.* at 294 (Cardiomegaly: "Abnormal enlargement of the heart from either hypertrophy or dilation.").

abdominal discomfort. Dr. Bazaldua assessed: abdominal pain due to possible gastroesophageal reflux; groin pain due to mild herniations; high cholesterol; and degenerative disc disease (DDD) (DE 10, p. 304). On September 8, 2004, the plaintiff presented to the NorthCrest ED at 14:12 with a chief complaint of diarrhea, vomiting, and rapid heartbeat for one day. The plaintiff underwent a cardiac catheterization with angiography[5] on September 9, 2004, which showed mild coronary artery disease, but was otherwise normal (DE 10, pp. 516-49).

On March 10, 2005, after a motor vehicle accident (MVA) on March 1, 2005 (DE 10, p. 479), the plaintiff presented to Dr. Alan Bachrach with a chief complaint of "pinching between my shoulder blades…running into my hands." (DE 10, p. 796). Dr. Bachrach reported that the results of nerve and muscle studies were consistent with carpal tunnel syndrome, the abnormality was very mild, and it was unlikely that the results were due to the MVA or that they explained the pain (DE 10, p. 797). On March 18, 2005, the plaintiff presented to the NorthCrest ED at 20:40 with a chief complaint of chest pain that began while arguing (DE 10, p. 505). The plaintiff was offered admission, but refused (DE 10, p. 512). On April 04, 2005, the plaintiff presented to Millbrook Medical Center (Millbrook) to follow up after the MVA in March. The physician reported a slightly decreased range of motion in the lower extremities and back and diagnosed the plaintiff with muscle spasms (DE 10, p. 479).

On April 12, 2006, the plaintiff presented to the NorthCrest ED at 19:11 with a chief complaint of chest pain that he had been experiencing for one week, that worsened with deep breaths and movement. A chest x-ray revealed no disease (DE 10, pp. 652-62). On June 27, 2006, the plaintiff presented to the NorthCrest ED at 22:21 with a chief complaint of back pain, and reported that he had been involved in a MVA two to three hours previously. A spine x-ray

---

5 *Id.* at 84 (Angiography: "The radiographic visualization of blood vessels following introduction of contrast material; used as a diagnostic aid in such conditions as stroke syndrome and myocardial infarction.").

revealed small bone spurs, mild compression, and DDD (DE 10, pp. 491-500). On July 20, 2006, the plaintiff presented to Millbrook with a chief complaint of back pain, due to the MVA in June (DE 10, p. 466). A Magnetic Resonance Imaging (MRI) revealed DDD, a small bulging disc, and a small disc tear (DE 10, p. 636).

On January 28, 2008, the plaintiff presented to the NorthCrest ED at 3:00. He was diagnosed with elevated blood pressure (DE 10, p. 596). On February 9, 2009, the plaintiff presented to the NorthCrest ED at 12:37 with a chief complaint of back pain. He was treated and discharged (DE 10, p. 814).

### B.    Psychiatric and Consultatative Assessments

On August 22, 2007, the plaintiff underwent a psychological evaluation in connection with his benefits application, performed by Arthur Stair, M.A., LPE (Stair). Stair reported that the plaintiff:   was oriented; was capable of understanding simple information; was able to comprehend and implement complex instructions, depending on the complexity, due to estimated low average IQ; was able to maintain persistence, and concentration on task for a full workday and workweek, with moderate impairment given moderate major depressive disorder; and had mildly to moderately impaired relationships. Stair reported that the plaintiff's GAF score[6] was approximately 52 (DE 10, pp. 806-07).

On August 31, 2007, the plaintiff underwent a consultative examination in connection with his benefits application, performed by Dr. Lloyd Huang. Dr. Huang reported that the plaintiff:   was obese; could not bend his legs more than 45 degrees; had normal range of motion except some reduced range of motion in the neck and lower back (DE 10, pp. 799-801). Dr. Huang reported that the plaintiff could "get up and down from the exam table with mild

---

6 *See infra* Part IV.B.1.

difficulty. In the exam room, he walked with exaggerated limp, which improved when exiting the office and on exam room, his limp was extremely severe. Also range of motion decrease appeared exaggerated." Dr. Huang commented:

> "[t]he patient's range of motion were out of proportion to exam findings and x-rays. Also, he was observed to exit the office in much better condition than his exam would indicate in the exam room. Regarding the patient's work related capacity, I estimate the patient can occasionally lift twenty pounds, frequently lift ten pounds, can stand and walk for five hours of an eight hour day, and sit for six hours of an eight hour day."

(DE 10, pp. 800-01). Dr. Huang diagnosed the plaintiff with DDD (DE 10, p. 800).

On December 12, 2007, the plaintiff underwent an intake assessment at Centerstone Mental Health Clinic (Centerstone), performed by Holli Turiglio, LPC-MHSP, who reported that the plaintiff was prescribed Zoloft one year previously but that it was not effective and was discontinued one month previously due to loss of insurance (DE 10, p. 762). The provider recommended depression medication and therapy (DE 10, p. 762). The plaintiff signed a plan that included goals of increasing energy, participating in therapy, processing his problems, and identifying volunteer opportunities or a job (DE 10, pp. 733-34). The plaintiff's GAF was 40, and in the previous 6 months, the lowest GAF was 30 (DE 10, p. 699). The plaintiff attended therapy on January 24, 28, February 18, and 28, 2008 (DE 10, pp. 751, 749, 746, 741). On January 24, 2008, the plaintiff's GAF was 40 (DE 10, p. 753). On February 28, 2008, the plaintiff's GAF was 54 (DE 10, p. 743). Since the plaintiff missed therapy on March 17, 27, 31, and April 14, 2008 (DE 10, pp. 736-40), treatment was terminated (DE 10, p. 724).

On January 3, 2008, the plaintiff underwent a psychiatric evaluation, performed by Elizabeth Swope, who reported that the plaintiff had: acute adjustment disorder with depressed mood; arthritis in his back; carpal tunnel; and problems with jobs, housing, and access to healthcare (DE 10, p. 730).

On May 20, 2009, the plaintiff returned to Centerstone for a second intake assessment, performed by Barbara T. Strausser, who reported that the plaintiff had chronic adjustment disorder with depressed mood. On May 20, August 21, October 07, 2009, May 05, and February 24, 2010, the plaintiff's GAF was 45 (DE 10, pp. 722, 915, 900, 923, 869).

### C.        Testimonial Evidence

### 1.        Plaintiff and Witness Testimony

On April 21, 2010, the plaintiff testified on direct examination by the ALJ, James W. Lessis (DE 10, pp. 33-58). The plaintiff testified that he was forty-seven years old. He testified that he did not graduate from high school, did not obtain a General Education Degree (GED), attended high school until tenth grade, and was able to read and write below a tenth grade level. He testified that he was five feet, ten inches tall, weighed about three hundred and five pounds, and attributed a fifty-five pound weight gain to blood pressure medicine. He testified that this weight gain was the only side effect from his medications (DE 10, pp. 37-39).

The plaintiff testified that he did not have a job, and that his last employment was as a self-employed car dealer until he quit in 2003. He testified that he received food stamps, lived in his father's trailer, and that his father paid his light and phone bills (DE 10, pp. 37-38).

The ALJ asked the plaintiff to describe his physical and mental medical problems. The plaintiff testified that he had back problems, pain that radiated down his arms, was unable to pick anything up, had one numb leg, carpal tunnel in both wrists, high blood pressure, arthritis in his back, DDD, and depression (DE 10, p. 38).

The ALJ asked the plaintiff to describe his daily routine. The plaintiff testified "I lay around and watch TV. I get up about 11:00, and I watch TV and just sit around the house,

mostly. Do nothing. If I go to hurting, I lay back down, take a nap, get ready to go to bed. That's about it." (DE 10, p. 38).

After the ALJ's questioning, Friedlob questioned the plaintiff. He asked the plaintiff to describe his daily routine in 2003, when the plaintiff worked as a car dealer. The plaintiff testified that he "just laid on the couch" because his wife performed the bookwork, that he would occasionally speak with customers, and that sometimes he hurt so badly that he could not work. The plaintiff testified that prior to starting a car dealership, he had worked on cars and worked on a farm, but that he began the dealership because he could not work on cars anymore "because of computers and stuff on the cars." (DE 10, p. 40). The plaintiff testified that the dealership went bankrupt (DE 10, p. 40).

Friedlob asked the plaintiff to describe his medical problems. The plaintiff reiterated the same medical problems he had relayed to the ALJ. The plaintiff testified that he only took pain medication "when he really, really need[ed] it." (DE 10, p. 41).

Friedlob focused on the MVA on March 1, 2005 and asked the plaintiff "the neck and back pain you mentioned, is it fair to say that began in March of 2005, when you were in a car wreck, or if it didn't begin then, it became significantly worse at that time?" The plaintiff testified that "the neck and back, neck pain and everything began in 2005, after the car wreck, yes, sir." (DE 10, p. 41). The plaintiff testified that the high blood pressure began around the time of the MVA (DE 10, pp. 41-42).

Friedlob asked the plaintiff to describe his WPW syndrome. The plaintiff testified that the syndrome caused his heart to beat rapidly and that he had to "go to the hospital to get it to slow down." (DE 10, p. 42). The plaintiff testified that although he had treatment for the WPW, the rapid heart beating still occurred from time to time (DE 10, p. 42).

Friedlob asked the plaintiff about his depression. The plaintiff testified that he starting receiving treatment at Centerstone in 2007, but that his depression "had started back around the car wreck, the 2005. It had started because I wasn't able to work." (DE 10, p. 43). The plaintiff testified that it made him nervous to be around crowds, that he would go shopping only when he needed to, and that his family members would help him. The plaintiff testified that he was only able to stand for approximately five minute intervals (DE 10, pp. 44-45).

Next, Friedlob questioned Sherril Pentecost. He asked, "have you seen a difference in [the plaintiff] since…that car wreck back in March of 2005?" (DE 10, p. 45). The witness testified affirmatively and that she had to do "just everything" for the plaintiff (DE 10, p. 46).

## 2. Vocational Expert Testimony

The ALJ called the VE to testify. The VE testified that the plaintiff's past work as a car dealer is classified as light, skilled, SVP6[7] (DE 10, p. 47). The ALJ then presented the VE with three hypothetical scenarios, considering a hypothetical person of the same age and education as the plaintiff, but with varying RFC:

> The first hypothetical was a reduced range of light work; with postural functioning no more than occasional climbing, balancing, stooping, kneeling, crouching, crawling; with manipulative limitations no more than frequent reaching, handling, fingering, feeling; environmental limitations no more than occasional exposure to weather, cold, hot, wet, humid environments, vibration, moving mechanical parts, electric shock, hazardous exposed places, radiation, explosives, fumes, odors, dust, gases, poor ventilation; mentally limited to work involving no more than minimal contact with the public, co-workers, supervisors; [General Education Development (GED)[8]] at reasoning level 2, math and language at the lowest level, level 1 [(RML)].

---

7 SSR 00-4P, 2000 WL 1898704 ("The Dictionary of Occupational Titles (DOT) lists a **specific vocational preparation (SVP)** time for each described occupation. Using the skill level definitions in 20 C.F.R. §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.") (emphasis added).

8 Dictionary of Occupational Titles, Fourth Edition, Revised 1991, Appendix C – Components of the Definition Trailer. 1991 WL 688702 ("**General Educational Development (GED)** embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-

(DE 10, p. 48). Pertaining to this hypothetical, the VE testified that: (1) the plaintiff would be unable to perform his past relevant work; and (2) in consideration of the reduced range of light work, mental limitations, and GED levels, the plaintiff could perform light, unskilled work as (a) a garment bagger, with 1,000 employed in Tennessee and 58,000 employed nationally in this job; (b) a paper goods bander, with 2,550 employed in Tennessee and 159,000 employed nationally in this job; (c) a screw eye assembler, with 1,160 employed in Tennessee and 81,000 employed nationally in this job (DE 10, pp. 48-49).

> The second hypothetical was a reduced range of sedentary work, with all postural functioning at the negligible level: climbing, balancing, stooping, kneeling, crouching, crawling. The manipulative limitations, no more than frequent reaching, handling, fingering, feeling. Environmentally precluded from all but negligible exposure to the elements of weather, cold, hot, wet, humid environments, vibration, moving mechanical parts, electric shock, hazardous exposed places, radiation, explosives, fumes, odors, dust, gasses, poor ventilation. The same mental limitations as before, minimal contact with public, co-workers, supervisors. RML 2, 1, 1. Pedal limitations, use of foot controls, at the negligible level.

(DE 10, pp. 49-50). Pertaining to this hypothetical, the VE testified that the plaintiff could perform sedentary, unskilled work as (1) a table worker, with 12,270 employed in Tennessee and 464,000 employed nationally in this job; (2) a woodworking dowel inspector with 1,840 employed in Tennessee and 64,000 employed nationally in this job; (3) an optical lens inserter with 2,500 employed in Tennessee and 81,980 employed nationally in this job (DE 10, p. 50).

The third hypothetical was the same as the second, except for a RML of 1, 1, 1.[9] Pertaining to this hypothetical, the VE testified that the RMLs on the three occupations listed in response to the second hypothetical were 1, 1, 1 and those occupations would therefore fit the limitations of the third hypothetical (DE 10, pp. 50-51).

---

study. The GED Scale is composed of three divisions: **Reasoning Development, Mathematical Development, and Language Development.**") (emphasis added).
9 *See supra* note 7.

Case 3:12-cv-00154   Document 20   Filed 06/04/13   Page 10 of 30 PageID #: 1066

### III.        Analysis

#### A.        Standard of Review

The issue before the Court, pursuant to 42 U.S.C. § 405(g), is limited to whether there is substantial evidence in the record to support the Commissioner's findings of fact. "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Carrelli v. Comm'r Of Soc. Sec.*, 390 F. App'x 429, 434 (6th Cir. 2010) (quoting *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir.1994)). The Court "may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Carrelli*, 390 F. App'x 429 at 434.  If there is "substantial evidence" in the record that supports the Commissioner's decision and the Commissioner applied the correct legal standard, then the Court must affirm the Commissioner's final decision, "even if the Court would decide the matter differently, and even if substantial evidence also supports the [plaintiff's] position." *Id.* (quoting *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.1986) (en banc)).

#### B.        Administrative Proceedings

Disability is defined consistently for Title II DIB and Title XVI SSI claims as an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…." 42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1505 and 416.905. The ALJ uses a five-step sequential evaluation for both DIB and SSI claims to determine whether the plaintiff meets this definition of "disabled." 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

i.  If the plaintiff is engaged in substantial gainful activity, the Court will find that the plaintiff is not disabled.

ii.  If the plaintiff *does not* have a severe medically determinable physical or mental impairment meeting the duration requirement or a combination of such impairments, the Court will find that the plaintiff is not disabled.

iii.  If the plaintiff *does* have an impairment(s) that meets or equals one of the listings of impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1 (Appendix 1) and meets the duration requirement, the Court will find that the plaintiff is disabled.

iv.  The court considers the plaintiff's Residual Functional Capacity (RFC) and past relevant work. If the plaintiff can still perform their past relevant work, the Court will find that they are not disabled.

v.  The Court considers the plaintiff's RFC, age, education, and experience to determine if the plaintiff can perform work *other than* past relevant work. If the plaintiff can make an adjustment, the Court will find that they are not disabled.

The plaintiff has the burden of proof for steps one to four. *Carrelli*, 390 F. App'x at 435. The burden shifts to the Commissioner at step five, where the Commissioner must "identify a significant number of jobs in the economy that accommodate the [plaintiff's] RFC and vocational profile." *Id.* To meet the burden, the ALJ may use the medical-vocational guidelines in 20 C.F.R. pt. 404, Subpt. P, App. 2 (Appendix 2). 20 C.F.R. §§ 404.1569 and 416.969.

Appendix 2 is referred to as "the grid," and provides guidance to the ALJ in determining whether the plaintiff is disabled or whether significant numbers of *other* jobs exist for the plaintiff. *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003). "Where the findings of fact made with respect to a particular individual's vocational factors and RFC coincide with all of the criteria of a particular rule [in the grid], the rule directs a conclusion as to whether the individual is or is not disabled." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010) (quoting Appendix 2 at § 200.00(a)). Otherwise, instead of using the grid alone, the ALJ must consider all relevant facts. 20 C.F.R. §§ 404.1569 and 416.969.

Case 3:12-cv-00154   Document 20   Filed 06/04/13   Page 12 of 30 PageID #: 1068

**C.     Administrative Reliance on Vocational Expert Testimony**

If a plaintiff's limitations "do not satisfy the exact requirements of the medical-vocational guidelines, the ALJ [is] entitled to rely on the testimony of a VE in reaching his decision" as to whether the plaintiff is disabled or whether the plaintiff is not disabled and a significant number of jobs exist that the plaintiff can perform. *Range v. Soc. Sec. Admin.*, 95 F. App'x 755, 757 (6th Cir. 2004). If an "issue in determining whether [a plaintiff] is disabled is whether [their] work skills can be used in other work and the specific occupations in which they can be used…, [the ALJ] may use the services of a VE…." 20 C.F.R. §§ 404.1566(e) and 416.966(e).

What number of jobs in the national economy constitutes a "significant number" of jobs is a determination that must be made on a case-by-case basis. *Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990) (citing *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir. 1988)). The ALJ may consider "the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on." *Id.*

**D.     Notice of Decision**

On January 4, 2011, the ALJ denied the plaintiff's claims (DE 10, p. 14), and made the findings of fact and conclusions of law enumerated below (DE 10, pp. 19-27).

1. Claimant meets the insured status requirements of the Act through December 31, 2005.

2. Claimant has not engaged in substantial gainful activity since September 1, 2003, the alleged onset date.

3. Claimant has the following severe impairments: disorders of the spine, obesity, carpal tunnel syndrome, hypertension, and major depressive disorder.

4. Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1.

5. Claimant has the RFC to maintain employment at the level of lifting and carrying a maximum of 20 pounds occasionally and 10 pounds frequently; to stand and walk 2 hours in a 8-hour workday; to sit 6 hours in an 8-hour workday; he can occasionally climb, balance, stoop, kneel, crouch and crawl; he is restricted to frequent reaching, handling, fingering and feeling; and occasional exposure to extreme temperatures, vibrations, moving mechanical parts, electric shock, hazardous exposed place, radiation, explosives, and to fumes, odors, dust, gasses, and poor ventilation. Furthermore, he is limited to minimal contact with the public, co-workers, and supervisors, from a mental standpoint, the claimant retains the reasoning, mathematics and language skills to perform work with understanding and carrying out detailed but uninvolved written or oral instructions, dealing with problems involving a few concrete variables in or from standardized situations encountered on the job, performing basic arithmetic operations, and reading, writing, and speaking in simple sentences using normal work order.

6. Claimant is unable to perform any past relevant work.

7. Claimant was…40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. Claimant has a limited education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Act, from September 1, 2003, through the date of this decision.

On January 4, 2011, the ALJ made the specific decisions below (DE 10, p. 27).

1. Based on the application for a period of disability and DIB filed on April 10, 2007, the claimant is not disabled under sections 216(i) and 223(d) of the Act.

2. Based on the application for SSI filed on April 10, 2007, the claimant is not disabled under section 1614(a)(3)(A) of the Act.

# IV.     Claims of Error

## A.     Whether the ALJ Improperly Evaluated the Plaintiff's Credibility

The plaintiff argues that (1) the ALJ failed to analyze the plaintiff's credibility and failed to consider the seven factors in 20 C.F.R. §§ 404.1529(c) and 416.929(c); (2) discredited the plaintiff based on the lack of medical care without considering the explanation of an inability to pay for care; and (3) gave inappropriate weight to Dr. Huang (DE 13, pp. 17-18).

### 1.     Two Step Credibility Analysis and Seven Factors

The plaintiff argues that the ALJ failed to perform an analysis of the plaintiff's credibility and failed to consider the seven factors in 20 C.F.R. §§ 404.1529(c) and 416.929(c).

At step five in the disability evaluation,[10] the ALJ uses the RFC from step four, where the ALJ considers the plaintiff's "impairment(s), and any related symptoms, such as pain." 20 C.F.R. §§ 404.1545 and 416.945. There is a two-step process for evaluating symptoms. First, "the [ALJ] must consider whether there is an underlying medically determinable physical or mental impairment…that could reasonably be expected to produce the individual's…symptoms." Second, "the [ALJ] must evaluate the intensity, persistence, and limiting effects of the…symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Social Security Ruling (SSR) 96-7P, 1996 WL 374186.

A plaintiff's symptoms will affect their ability to do basic work activities to the extent that the symptoms can reasonably be accepted as consistent with objective medical evidence. However, objective medical evidence alone does not always reflect the severity of symptoms. When information other than objective evidence is needed to determine the credibility of a plaintiff's statements about their symptoms, the ALJ must also consider seven factors, outlined

---

10 *See supra* Part III.B.

in 20 C.F.R. §§ 404.1529(c) and 416.929(c): (1) daily activities; (2) location, duration, frequency, and intensity; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medication; (5) treatment; (6) measures to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions.

The record shows that the ALJ used the two-step process for evaluating symptoms. First, the ALJ considered medical history from 1995 to 2010 (DE 10, pp. 21-25). The ALJ explicitly listed dates, complaints, diagnoses, and accidents (DE 10, pp. 21-24). The ALJ found that the plaintiff's "medically determinable impairment could reasonably be expected to cause some of the alleged symptoms." (DE 10, p. 24).

The ALJ next evaluated intensity, persistence, and limiting effects of the symptoms, and found a lack of credibility. The record shows that the ALJ explicitly listed the objective medical evidence and found that the paucity of evidence was inconsistent with the plaintiff's allegations (DE 10, p. 24). The record also shows that the ALJ considered the seven factors listed above, including: (1) daily activities. The ALJ found that "*in terms of daily activities*, [the plaintiff] stated that he does nothing but lay around and watch television." The record shows that for the following factors: (2) location, duration, frequency, and intensity; and (3) precipitating and aggravating factors, the ALJ went through a long review: "he reported experiencing rapid heartbeat for *one day* [duration]," "he reported *low right* [location] inguinal discomfort and pain in the *last couple of weeks* [frequency], which was *worse with lifting or excessive pulling* [precipitating and aggravating factors]," "he reported a *mild* [intensity] degree of anxiety and *moderated* [intensity] depression," "*occasional* [frequency] palpitations…, *worsened by stress* [precipitating and aggravating factors]." The ALJ considered (4) type, dosage, effectiveness, and side effects of medication; (5) other treatment; and (6) measures to relieve pain or other

symptoms: "he takes *over-the-counter pain medication* [type], but will take *narcotic pain medication* [type] *when the pain gets too bad* [effectiveness]," "medication *causes weight gain* [side effects]," "underwent an *intake assessment at Centerstone* [other treatment]," and "when the pain gets too bad, *he will go back to bed* [measures]." The ALJ considered (7) other factors concerning functional limitations and restrictions: "a doctor many years ago *restricted him* to lifting no more than five pounds, he could walk one to two blocks and he could stand for 20 minutes," "Dr. Huang opined that [the plaintiff] *could lift 20 pounds occasionally and 10 pounds frequently, he could stand and walk for five hours of an eight hour day, and could sit for six hours of an eight hour day*." (DE 10, pp. 21-23) (emphasis added).

The record provides substantial evidence that the ALJ did not find against the plaintiff's credibility because of a failure by the plaintiff to seek medical treatment, but that the ALJ found the plaintiff did seek medical treatment, but the results and diagnoses were normal, a disproportionate diagnosis to "allegedly disabling impairments." The ALJ considered that the plaintiff: had a "sinus rhythm [that] was normal;" a "cardiac catheterization, which was essentially normal;" "no atrophy of his hand;" "handgrip strength [that] was normal;" and was "neurologically intact." (DE 10, p. 24).

### 2. Evaluation of Uninsured Status

The plaintiff argues that the ALJ's finding against the plaintiff's credibility was based on "a belief that the plaintiff failed to seek regular medical treatment for his conditions" despite the plaintiff being uninsured (DE 13, pp. 16-17).

The ALJ is not permitted to draw inferences about a plaintiff's symptoms based on "failure to seek or pursue regular medical treatment" without considering explanations such as an inability to pay for care. SSR 96-7P, 1996 WL 374186.

Page **17** of 30

The record shows that the ALJ considered the plaintiff's uninsured status. The ALJ considered that on May 31, 2006, the plaintiff "presented to Robertson County Health Department to establish care" (DE 10, p. 22) but that later, on May 20, 2009, the plaintiff had lost TNCare insurance coverage and "presented to Centerstone…with complaints of increasing depression." (DE 10, p. 24, citing the record). The record shows that the ALJ considered loss of insurance noted at the first intake examination at Centerstone on December 12, 2007 when the plaintiff reported that his "Zoloft…was discontinued approximately one month ago due to loss of insurance (DE 10, p. 25, citing the record).

The record provides substantial evidence that the ALJ did not find against the plaintiff's credibility because of a failure by the plaintiff to seek medical treatment, as explained above,[11] or a failure by the plaintiff to seek medical treatment because of an inability to pay for care.

### 3. Weight Accorded to Consultative Examiner

The plaintiff argues that the ALJ "support[ed] his credibility finding by relying heavily on suspicions raised by [Dr. Huang]" and that "[Dr. Huang's] suspicions certainly do not justify a total disregard for plaintiff's testimony or that of other treaters and examiners…Indeed the Administration's other consultative examiner [Stair] specifically said that malingering is not suspected." (DE 13, p. 18).

SSR 96-2P, 1996 WL 374188, explains "terms used in [the] regulations on evaluating medical opinions" and when an opinion is "entitled to controlling weight." SSR 96-2P cites the following as authority: (1) 20 C.F.R. §§ 404.1502 and 416.902, which define, inter-alia, treating sources, non-treating sources, and non-examining sources; and (2) 20 C.F.R. §§ 404.1527 and 416.927, which pertain to the evaluation of medical opinion evidence.

---

11 *See supra* Part IV.A.1.

Under 20 C.F.R. §§ 404.1527(c) and 416.927(c), the ALJ must evaluate "every medical opinion," regardless of the source. Under (c)(1), the ALJ will give more weight to the opinion of a source who has examined the plaintiff than to a non-examining source. Under (c)(2),[12] the ALJ may give controlling weight to the opinion of a treating source. The rationale is that treating sources are likely "most able to provide a detailed, longitudinal picture of [the] medical impairment(s)…that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c) and 416.927(c).

When the ALJ does not give the treating source's opinion controlling weight, there are two requirements. First, the ALJ must apply the factors in (c)(2)(i)-(ii) and (c)(3)-(6) in determining what weight to give to the treating source's opinion: (c)(2)(i) length of the treatment relationship and the frequency of the examination. The ALJ will give more weight to the opinion of a treating source if the source has developed a longitudinal picture of the impairment(s); (c)(2)(ii) nature and extent of the treatment relationship. The ALJ will give more weight to the opinion of a treating source with more knowledge about the impairment(s) than to a treating source with less knowledge; (c)(3) supportable medical evidence; (c)(4) evidence that is consistent with the record; (c)(5) specialization of the source; (c)(6) other factors. Second, in the cases where the ALJ does not give the treating source's opinion controlling weight, the ALJ will provide good reasons for the weight given to the treating source's opinion. 20 C.F.R. §§ 404.1527(c) and 416.927(c); SSR 96-2P.

The record shows that the ALJ did not assign controlling weight and therefore considered the factors under 20 C.F.R. §§ 404.1527(c) and 416.927(c) in assigning weight (DE 10, p. 21).

---

12 The plaintiff cites 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) erroneously (DE 13, p. 21).

The record shows that the ALJ considered the (c)(2)(i) length and frequency of treatment; and (c)(2)(ii) nature and extent of the treatment relationship. The ALJ considered not only one-time visits with Dr. Huang and Stair, but also considered visits with other providers: "[the plaintiff] underwent radiofrequency ablation [*with Dr. Wheatley*] [nature and extent]," "[the plaintiff] had a Department of Transportation physical [*with Dr. Bazaldua*] [nature and extent]," "[h]e stated that he had last seen his primary care physician [*Dr. Rhodes*] one year previously [length and frequency]," "[a]n EMG/nerve conduction study [*with Dr. Bachrach*….] [nature and extent]" (DE 10, pp. 21-22) (emphasis added), "[h]e was terminated *for not following through* with his services [at Centerstone] [length and frequency]," "progress notes on June 10, 2009 indicated…[and the] *following month it was noted*….[length and frequency]." (DE 10, p. 24) (emphasis added). The ALJ considered (c)(3) supportable medical evidence; and (c)(4) evidence that is consistent with the record. The ALJ reviewed medical records *from 1995 to 2010* [consistent] (DE 10, pp. 21-24), and *records from the consultative and psychological examinations* [supportable] (DE 10, pp. 23-25, citing the record) (emphasis added).[13] The record shows that the ALJ "accorded substantial weight" to the opinion of Dr. Huang, (c)(5) the opinion of a specialist in his field (DE 10, p. 25).

The record provides substantial evidence that the ALJ found that the plaintiff's impairments could reasonably cause some of the alleged symptoms, but that the plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the [RFC]." (DE 10, p. 24). The record provides substantial evidence that the ALJ provided a good reason for the weight that he assigned by comparing the weight assigned to the opinions of the non-examining, examining,

---

13 16F should read 18F on DE 10, p. 23; 17F should read 18F on DE 10, p. 25.

and treating physicians: "Although the physicians employed by the State Disability Determination Services, who also found the plaintiff was 'not disabled' were non-examining and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight." (DE 10, p. 25).

The record provides substantial evidence that the plaintiff's claim of error, that the ALJ improperly evaluated the plaintiff's credibility, is without merit.

**B.    Whether the ALJ Improperly Relied on Global Assessment of Functioning (GAF) Scores**

The plaintiff argues the ALJ erred in relying on GAF scores because (1) the SSA has not endorsed the GAF scale and the ALJ should not use the GAF scale alone; (2) the ALJ gave greater weight to Stair than to treatment records; and (3) the ALJ ignored the weight of the evidence (DE 13, pp. 19-20).

### 1.    GAF Scale

The plaintiff argues first that the ALJ erred by relying on the GAF scores because the SSA has not endorsed the GAF scale and subsequently argues that the ALJ erred by relying on the GAF scores alone (DE 10, pp. 20-21).

The GAF is described in the Diagnostic and Statistical Manual of Mental Disorders (DSM) as "the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in [the SSA] mental disorders listings."[14] While the SSA has not endorsed the GAF for use in DIB and SSI applications, the Court has found that a GAF score "is a subjective determination"

---

14 Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 FR 50746-01, 50764-65.

representative of a professional opinion, "the clinician's judgment of the [plaintiff's] overall level of functioning."[15]

The record provides substantial evidence that the ALJ relied on the DSM and did not rely on GAF scores in violation of SSA policy or case precedent:  "According to the DSM, a GAF rating of 54 denotes moderate symptoms or moderate impairment in social, occupational or school functioning, but is not consistent with a mental impairment of disability severity." (DE 10, p. 25).

There would be a consequence at this juncture if the plaintiff's argument, that the ALJ erred by relying on the un-endorsed GAF scores, was meritorious. If the ALJ had erred under this argument, then the plaintiff's sub-claim, that the ALJ erred by relying only on scores above 50, would fail because the ALJ could not rely on an un-endorsed scoring system at all.

The record provides substantial evidence that that the ALJ relied on more than GAF scores alone, as explained below,[16] because the ALJ relied on multiple sources of evidence.

## 2.    Weight Accorded to Consultative Examiner

The plaintiff argues that the ALJ "gave greater weight to [Stair] than plaintiff's treating providers." (DE 13, p. 21).

As explained above,[17] SSR 96-2P and 20 C.F.R. §§ 404.1527(c) and 416.927(c) pertain to the evaluation of medical opinions and the assignment of controlling weight. The record shows that the ALJ did not assign controlling weight and therefore considered the factors under 20 C.F.R. §§ 404.1527(c) and 416.927(c) in assigning weight. The record shows that the ALJ

---

15 DeBoard v. Comm'r of Soc. Sec., 211 F. App'x 411, 415 (6th Cir. 2006) (quoting Wesley v. Comm'r of Soc. Sec., No. 99–1226, 2000 WL 191664, at *3 (6th Cir. Feb. 11, 2000) (quoting Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed.1994))).
16 *See infra* Part IV.B.2.
17 *See supra* Part IV.A.3.

Case 3:12-cv-00154   Document 20   Filed 06/04/13   Page 22 of 30 PageID #: 1078

considered the (c)(2)(i) length of the treatment relationship and the frequency of the examination; and (c)(2)(ii) nature and extent of the treatment relationship, as explained above.[18] The ALJ considered (c)(3) supportable medical evidence; and (c)(4) evidence that is consistent with the record. The ALJ cited 13F/67-73, records from *treating providers at Centerstone*, when the plaintiff received a <u>GAF score of 40</u> on December 12, 2007 [consistent]. Here, the ALJ also cited *hand-written notes from the plaintiff's physician* on May 31, 2006, referring the plaintiff to Centerstone [supportable]. Next, the ALJ cited exhibit 13F/52-54, documenting *a Centerstone* <u>GAF score of 54</u> on February 28, 2008, and exhibit 13F/35-36, a *Centerstone* visit documenting that the plaintiff was terminated for not attending treatment sessions and that the last known GAF score from February 28, 2008 <u>was 54</u> [consistent]. Next, the ALJ noted that the plaintiff underwent the *second intake assessment at Centerstone* and received a <u>GAF score of 45</u> on May 5, 2009. Here, the ALJ also cited 13F/21, 19, 12, the *Centerstone treatment records* from June 10, July 1, and August 5, 2009 and the ALJ noted that the plaintiff's "mood improved with treatment" while the *GAF score remained unchanged* when it was next measured on January 29, 2010 [consistent]. The record shows that the ALJ "accorded substantial weight" to the opinion of Stair, (c)(5) the opinion of a specialist in his field (DE 10, pp. 24-25) (emphasis added).

The record provides substantial evidence that the ALJ did not assign controlling weight and provided a good reason for the weight that he assigned[19] (DE 10, p. 25).

### 3.    Weight of the Evidence

The plaintiff argues the ALJ relied solely on Stair's GAF score of 52 and Centerstone's GAF score of 54, and that the latter was a "cherry-picked score [that] stood in stark contrast to every other GAF score assigned to plaintiff over several years of treatment at Centerstone." (DE

---

18 *Id.*
19 *Id.*

Case 3:12-cv-00154   Document 20   Filed 06/04/13   Page 23 of 30 PageID #: 1079

13, p. 22). The plaintiff purports to list 21 GAF scores to argue that the ALJ only considered the scores above 50 and ignored the weight of the evidence.

The record shows that the 21 GAF scores that the plaintiff cites are not all GAF scores based on isolated mental health exams. To the contrary, many of the scores that the plaintiff cites are derived from activity or progress notes from Centerstone, noting that the GAF score is "current," but also noting specifically that "there is *no mental status exam* for this progress note." (DE 10 October 5, 2009, p. 903; November 04, 2009, p. 889; December 4, 2009, pp. 878-80) (emphasis added). For other scores, there is no indication in the record that the mental status exam was conducted because there is a lack of any notation in the mental status exam section of the report (DE 10 January 29, 2010, p. 874; June 14, 2010, p. 949; July 12, 2010, p. 946; August 9, 2010, p. 941; September 8, 2010, p. 935; December 1, 2010, p. 924). For two visits, the document is a diagnosis list, with the GAF of 45 listed as having a start date of May 20, 2009, but no mental status exam visit report (DE 10 August 12, 2009, p. 692; April 6, 2010, p. 860). For one visit, the GAF of 45 is listed as having a start date of May 20, 2009, but the visit is from January 03, 2008 (DE 10, p. 730). This eliminates twelve GAF scores that the plaintiff cites.

The record shows that there were two GAF scores above 50 and seven below 50, not nineteen below 50. The record provides substantial evidence that the ALJ gave consideration in totality to the GAF scores, treatment records, physician records, and hand-written notes, and that the ALJ did not ignore the weight of the evidence.

The record provides substantial evidence that the plaintiff's claim, that the ALJ erred by relying on GAF scores, assigning weight inappropriately, and ignoring the weight of the evidence, is without merit.

## C. Whether the ALJ Improperly Assessed the Plaintiff's Obesity

The plaintiff argues that the ALJ erred by failing to adequately address the plaintiff's obesity at the third through fifth steps of the disability evaluation.

As explained above,[20] the ALJ uses a five-step disability evaluation. At the third step, the ALJ determines whether the impairment(s) meets a listing in Appendix 1 (the listings). The listings describe "impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience" and the regulations include the "objective medical and other findings needed to satisfy the criteria of that listing." If the plaintiff's impairment or combination of impairments does not *meet* one of the listings, the ALJ will also consider whether the impairment or combination of impairments is "*medically equivalent* to a listed impairment in appendix 1." 20 C.F.R. §§ 404.1525, 404.1526(b) and 416.925, 416.926(b) (emphasis added). The listings do not include obesity. Yet, SSR 02-1P, 2000 WL 628049 instructs ALJs to consider obesity and the SSA also includes this mandate in the listings.[21]

At the third step, SSR 02-1P instructs ALJs to consider whether (1) obesity meets the requirements of a listing; and whether (2) obesity is medically equivalent to a listing.

"Because there is no listing for obesity, [the ALJ] will find that [a plaintiff] with obesity '*meets*' the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing." The ALJ will also find that a plaintiff with obesity "*meets*" the

---

20 *See supra* Part III.B.

21 20 C.F.R. pt. 404, Subpt. P, App. 1 Q ("Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.").

Case 3:12-cv-00154   Document 20   Filed 06/04/13   Page 25 of 30 PageID #: 1081

requirements of a listing if the plaintiff has "an impairment that, in combination with obesity, meets the requirements of a listing." As an example, SSR 02-1P indicates "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders." SSR 02-1P (emphasis added).

"[The ALJ] may also find that obesity, by itself, is *medically equivalent* to a listed impairment…For example, if the obesity is of such a level that it results in an inability to ambulate effectively…it may substitute for the major *dysfunction of a joint*(s)...." Finally, the ALJ may find that a plaintiff's impairments are *medically equivalent* to a listed impairment if the plaintiff "has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment." As an example, SSR 02-1P indicates "obesity affects the cardiovascular and respiratory systems…[The ALJ] may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or *cardiovascular* listings." SSR 02-1P (emphasis added).

At the fourth and fifth steps, SSR 02-1P instructs the ALJ to consider obesity in assessing RFC and reminds ALJs that obesity can limit a plaintiff's function.[22] The ALJ should assess "the effect obesity has upon the [plaintiff's] ability to perform…within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time."

---

22 SSR 02-1P, 2000 WL 628049 ("The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.").

SSR 02-1P requires that the ALJ explain how they reached the conclusion "on whether obesity caused any physical or mental limitations." SSR 02-1P.

At the third step, the record shows that the ALJ considered the plaintiff's impairments and supported his conclusion. The ALJ considered the plaintiff's severe impairments, including obesity, and concluded that "the [plaintiff's] impairment[s] do not meet or medically equal the required level of severity for listings: (1) 1.02, major dysfunction of a joint(s); (2) 1.04, disorders of the spine; (3) 4.01, cardiovascular system; (4) 11.14, peripheral neuropathies; (5) 12.04, affective disorders; (6) 12.09, substance addiction disorders; or any other listed impairment." (DE 10, p. 19). The ALJ itemized several listings he considered, including the listings that SSR 02-1P cites as examples of listings for which an ALJ may find that obesity is *medically equivalent* to a listed impairment (1.02, major dysfunction of a joint), or for which an ALJ may find that obesity in combination with a plaintiff's other impairments is *medically equivalent* in severity to a listed impairment (4.01, cardiovascular system) (DE 10, p. 19) (emphasis added).

At the fourth step, the record shows that the ALJ made his conclusion about the plaintiff's RFC "after careful consideration of the entire record." (DE 10, p. 20). The ALJ acknowledged the plaintiff's weight throughout the decision (DE 10, pp. 21, 24, 25) and noted "although the [plaintiff] is somewhat obese, he is capable of performing a range of light work. The effects of obesity upon the [plaintiff's] ability to function were considered in accordance with SSR 02-1P and are reflected in the RFC assessed in this case." (DE 10, p. 25).

At the fifth step, the record shows that the ALJ considered how the plaintiff's RFC affected his ability to perform other jobs. The ALJ noted that the plaintiff's ability "to perform all or substantially all of the requirements of [a full range of light work] has been impeded by additional limitations." (DE 10, p. 26). The ALJ considered the plaintiff's obesity as a limitation

in determining RFC, the RFC resulted in an erosion of "the unskilled light occupational base," and the ALJ proceeded with step five to determine the plaintiff was not disabled. (DE 10, p. 26).

The record provides substantial evidence that the plaintiff's claim, that the ALJ failed to adequately address the plaintiff's obesity, is without merit.

### D.    Whether the ALJ Improperly Assessed the Plaintiff's Limitations

The plaintiff argues that the ALJ erred by failing to address all of the plaintiff's impairments when determining the plaintiff's RFC. The plaintiff argues that the ALJ failed to address the plaintiff's moderate limitation in the ability to maintain concentration, persistence or pace, and the plaintiff's limitations from the severe impairment of carpal tunnel syndrome.

The ALJ determines the plaintiff's RFC based on all relevant evidence in the record and considers all of the plaintiff's medically determinable impairments, including those that are not severe. The ALJ will consider (1) medical history; (2) medical reports; (3) consultative examination reports; (4) statements from medical sources; (5) descriptions of symptom-based limitations; (6) statements from the plaintiff; and (7) statements from family or others. 20 C.F.R. §§ 404.1545(a)(1)-(3) and 416.945(a)(1)-(3).

Regarding medical history, the SSA must develop the "medical history for at least the 12 months preceding the month in which [the plaintiff] file[s]...." Regarding medical reports, the SSA must "help [the plaintiff] get medical reports...." Regarding consultative examinations, the SSA "may ask [the plaintiff] to attend...[physical or mental] consultative examinations at [the expense of the SSA]." 20 C.F.R. §§ 404.1512 and 416.912. Regarding statements and descriptions, "[i]n assessing the total limiting effects of [the plaintiff's] impairment(s) and any

related symptoms, [the SSA] will consider all of the medical and nonmedical evidence, including the information described in 20 C.F.R. §§ 404.1529(c) and 416.929(c)."[23]

The record shows that the ALJ considered the factors listed above, including: (1) medical history. The plaintiff filed on April 10, 2007 and the ALJ reviewed the medical history starting in 1995, beyond the required 12 months before the filing (DE 10, p. 21). The ALJ considered the plaintiff's moderate limitation in concentration, persistence, and pace. The ALJ considered GAF scores in the (2) medical reports; the (3) consultative report; and as reported in (4) statements from medical sources, as explained above.[24] The ALJ accorded substantial weight to the opinion of Stair, who noted that the plaintiff had the ability to "maintain persistence, and concentration on tasks for a full workday and workweek" with moderate impairment, given the plaintiff's "moderate major depressive disorder." (DE 10, p. 25, citing the record). The ALJ considered (5) descriptions of symptom-based limitations; and (6) statements from the plaintiff, as described above;[25] and (7) statements from family or others when hearing from Sherril Pentecost, describing how she had to do "just everything" for the plaintiff (DE 10, p. 46). The record shows that the ALJ considered how the plaintiff's mental impairments, "singly and in combination do not meet the listings 12.04 and 12.09." (DE 10, p. 20).

The record shows that the ALJ considered the plaintiff's limitations from carpal tunnel. The ALJ considered the (2) medical reports; the 3) consultative report; and (4) statements from medical sources: "[study results] were consistent with an entrapment of the median nerves at the wrists as seen in *carpal tunnel syndrome*," Dr. Huang noted that the plaintiff reported "bilateral *carpal tunnel syndrome*." (DE 10, pp. 22-23) (emphasis added). The ALJ considered (5)

---

23 *See supra* Part IV.A.1.
24 *See supra* Part IV.B.
25 *See supra* Part IV.A.1.

descriptions of symptom-based limitations; and (6) statements from the plaintiff: "[the plaintiff] testified that he has *carpal tunnel* in his wrists." (DE 10, p. 21) (emphasis added). The ALJ considered (7) statements from family or others, as described above.

The record provides substantial evidence that the plaintiff's claim, that the ALJ failed to address all of the plaintiff's impairments when determining the plaintiff's RFC, is without merit.

## V.      Conclusion

There is substantial evidence within the record to support the Commissioner's findings of fact and the Commissioner applied the correct legal standard. There is not substantial evidence within the record to demonstrate otherwise or to support the plaintiff's claims of error.

## VI.      Recommendation

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion (DE 12) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

The parties have fourteen (14) days, after being served with a copy of this Report and Recommendation (R&R) to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140 *reh'g denied*, 474 U.S 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this _____ day of June, 2013.

s/Joe B. Brown_____
Joe B. Brown
U.S. Magistrate Judge